2017 UT App 48

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
MARTIN J. MACNEILL,
Appellant.

Opinion
No. 20140873-CA
Filed March 16, 2017

Fourth District Court, Provo Department
The Honorable Derek P. Pullan
No. 121402323

B. Kent Morgan and Jonathan T. Nish, Attorneys
for Appellant

Sean D. Reyes and Tera J. Peterson, Attorneys
for Appellee

JUDGE J. FREDERIC VOROS JR. authored this Opinion, in which
JUDGES GREGORY K. ORME and STEPHEN L. ROTH concurred.

VOROS, Judge:

¶1 Martin J. MacNeill was convicted of murdering his wife by overmedicating her then drowning her in a bathtub. At trial the prosecution presented testimony from five jailhouse informants, all of whom reported hearing MacNeill admit or imply that he had killed his wife. MacNeill's principal claim on appeal is that the prosecution team withheld information about promises of assistance the State's lead investigator, Jeff Robinson, had made to one of the jailhouse informants. After meticulous analysis, the trial court agreed with MacNeill that the prosecution had wrongly suppressed relevant impeachment evidence, but concluded that the evidence would not have altered the trial outcome. We affirm.

## BACKGROUND[1]

### *The Crime*

¶2    MacNeill lived with his wife, Michele, and their four minor daughters in Pleasant Grove, Utah. The MacNeills also had three adult children; two lived in Utah and one attended graduate school out of state. MacNeill practiced psychiatry, and Michele tended to their home and children.

¶3    MacNeill met Gypsy Gillian Willis online, and the two began an affair in November 2005. In March 2007 Michele expressed concern to her adult daughter, Alexis, who attended graduate school, that MacNeill might be having an affair. After reading through his telephone records, Michele discovered the identity of MacNeill's girlfriend. When she confronted MacNeill, he claimed she was being "ridiculous." Shortly after this confrontation, MacNeill surprised Michele with a facelift as a "present." He also indicated that he wanted to take her on a two-week cruise after her surgery.

¶4    Around the same time, during a "heartfelt, tearful lesson" at church, MacNeill announced that he had cancer and had "less than a year" to live. His health appeared to deteriorate—he began limping, walking with a cane, and wearing a surgical boot. Despite his claim to neighbors that he "had some procedures done [and] was having some complications," MacNeill painted a somewhat different picture of his condition at work. He told one colleague that he had a "peripheral neuropathy" in his toe that "wouldn't get better," another colleague that he had "cancer in his big toe," and yet another

---

1. "When reviewing a jury verdict, we examine the evidence and all reasonable inferences drawn therefrom in a light most favorable to the verdict, and we recite the facts accordingly." *State v. Kruger*, 2000 UT 60, ¶ 2, 6 P.3d 1116.

colleague that he had a "neurological . . . problem similar to MS." But despite his scattered claims of various illnesses during that spring, MacNeill remodeled his basement on his own and appeared to have no difficulty carrying "giant [slabs] of sheet rock" down the stairs.

¶5      MacNeill scheduled a consultation with a plastic surgeon in March 2007 and attended the consultation with Michele. MacNeill was the "dominant personality" at the appointment and did "more of the talking" than Michele. Although Michele was nervous about having surgery and concerned about the associated risks, the recovery, and the downtime, she agreed to schedule comprehensive facial surgery for the following month.

¶6      MacNeill next scheduled an examination for Michele with a primary care physician to determine if it was safe for her to proceed with surgery. MacNeill was anxious to complete the evaluation so Michele could proceed with the surgery without delay. At the appointment, the three discussed Michele's high blood pressure. The primary care physician said that it would be ideal to control Michele's blood pressure before surgery and suggested that she postpone the operation. MacNeill expressed disappointment with this suggestion. Other than Michele's elevated blood pressure, the primary care physician determined that she was in "excellent health." An EKG revealed that Michele's heart was normal without any arrhythmias or evidence of heart disease.

¶7      Although the primary care physician recommended that Michele delay the procedure, Michele and MacNeill kept the appointment for the preoperative evaluation with the surgeon. Alexis came home from graduate school to attend the appointment with them. Before the appointment, Alexis saw MacNeill in his room writing down medications that he wanted the doctor to prescribe, using a "dusty" reference book that she hadn't seen him use in perhaps ten or fifteen years. On the way

to the appointment, Michele said that she wanted to push the appointment back until summer so she could make sure her blood pressure would be under control. MacNeill became angry, raised his voice, told Michele she could not do that, and said, "If you don't have the surgery now, you're not getting it."

¶8     At the appointment, neither Michele nor MacNeill disclosed the primary care physician's recommendations, although MacNeill did mention that she had "some high blood pressure" and "had been prescribed some medication" for it. MacNeill directed the discussion about Michele's postoperative medication regimen. After performing a facelift, the surgeon typically prescribed a pain reliever (Lortab), an antibiotic (cephalexin), a sleeping medication (Ambien), an anti-inflammatory (Medral Dose Pack), and an eye ointment (erythromycin). Occasionally, he prescribed an anti-nausea medication (Phenergan) to patients that complained of nausea associated with anesthesia.

¶9     Consulting the list he brought with him, MacNeill requested four deviations from the surgeon's usual protocol. First, he requested an additional, stronger pain reliever, oxycodone, also known as Percocet. Second, he requested Lortab in liquid form. Third, he requested more than the typical amount of Phenergan, and he requested it in suppository form. Finally, he requested the anti-anxiety drug, Valium. MacNeill said that "he was just concerned that [Michele] wouldn't do well without having these other options available," and that he wanted to have "all of the options available to [him]," even though Michele had told him that she didn't like to take a lot of medicine. The surgeon complied with MacNeill's requests and gave Michele instructions to take one pill at a time and "certainly" to avoid taking all of them together. Michele assured the surgeon she "was going to try and minimize the amount of medication that she took."

¶10   Two days later, MacNeill drove Michele and Alexis to the surgical facility for the operation. The surgery lasted all day, but the surgeon told Alexis that he was happy with the results. Michele was "in a little bit of pain and groggy" and "wanted to stay the night at the hospital." MacNeill returned to drive Michele and Alexis home. When Michele said she wanted to stay the night, he became angry and told Michele that they needed to go home. But he acquiesced when the surgeon explained that he prefers to keep his patients overnight. The surgeon released Michele the next morning.

¶11   On the day Michele returned home, Alexis acted as her caregiver, giving her medications, dressing her wounds, and helping her to the bathroom, because Michele was "effectively blind." Alexis kept a log of Michele's medications on a pad of paper and included the time she took each pill and the dose. Alexis also kept a log of Michele's vital signs and food intake in what she called her "little black book." She later combined the two logs and placed the pad of paper in a drawer next to Michele's bed. That evening MacNeill insisted that Alexis leave the room because he would be taking over Michele's care. Alexis left and slept in her youngest sister's room.

¶12   The next morning Alexis entered her mother's room and noticed that she "appeared to be very sedated." When Alexis tried to wake Michele, she stirred a bit but did not wake up. Alexis asked MacNeill what had happened, and he responded that he "must have given her too much medicine." When Alexis pressed further, he said he had given Michele Lortab, Valium, and Ambien, at which point Michele threw up. He then gave her Phenergan, Percocet, and more Lortab. Alexis told her father that he was "not to give her any more medicine," because she (Alexis) was "taking over."

¶13   Later that evening Michele told Alexis that MacNeill "kept giving [her] medication" and "telling [her] to swallow,"

and when she started to throw up he gave her more and more medication. Michele stated that she did not want MacNeill to give her any more medicine; she felt each different pill "so that if [MacNeill] tried to give her anything, she would know what he was giving her."

¶14    Alexis continued to care for her mother. Once Michele's bandages came off, her recovery accelerated. By April 10 Michele was able to walk around and care for herself. She took no Valium, Phenergan, or Ambien. Because Michele was sensitive to medications, she tried to take less than the prescribed dosage. Although Michele was tapering off her medications, MacNeill called the surgeon and asked him to refill Michele's prescriptions for Percocet and Phenergan, which he did at a follow-up appointment. Alexis attended the appointment with Michele, then returned to school.

¶15    The next day MacNeill took the couple's younger daughters to school. Before leaving for school, one of the girls entered Michele's room and found her mother sitting on the couch in front of her TV. The girl noticed "nothing odd about [Michele's] behavior." The two "had a perfectly . . . normal conversation" before the girl said goodbye and went to school. Alexis called at 8:45 a.m. and Michele said she was "doing great" and planned to pick the girls up from school. She did not sound confused, and her speech did not sound slurred. At 9:15 a.m., MacNeill called Alexis and left a voicemail urging her to call her mother and tell her to stay in bed. Alexis found this strange in light of her earlier phone conversation with her mother. Alexis called her mother, but Michele did not answer.

¶16    MacNeill was to receive an award at work that morning. Before the event MacNeill adamantly told the event coordinator that he needed his picture taken at the event. After receiving the award, he asked the photographer, "Did you get me in that picture? Make sure you got me in that picture." After the

photographer assured MacNeill that he was in the picture, MacNeill pressed him again, saying, "Maybe you better take a second one and make sure you got me in that picture." After the event, MacNeill picked up the couple's youngest daughter from kindergarten at 11:30 a.m.

¶17    When MacNeill and his youngest daughter got home, she called, "Mom, I'm home." Michele didn't answer. The girl followed her father into the bathroom and found her mother "all the way" in the bathtub, lying in the water, still in her clothes. MacNeill told his daughter to run next door for help.

¶18    Meanwhile, MacNeill called 911. MacNeill gave the dispatcher a false address and hung up. MacNeill called again and said, "My wife has fallen in the bathtub . . . [s]he is unconscious. She's under water." MacNeill said he "couldn't lift her" so he let the water out of the tub. Although the dispatcher asked him to stay on the phone, MacNeill hung up again. The dispatcher called back, and MacNeill told her that he had "CPR in progress." Although the dispatcher requested that he stay on the phone, MacNeill again hung up. He then called a colleague at work and told him he was "doing a code on his wife." At this time, MacNeill's phone rang again—it was Alexis. He told her, "Your mother's in the tub and she's not breathing." Alexis immediately went to the airport to fly home.

¶19    The daughter returned to the bathroom with their neighbor. They found MacNeill "hunched over" Michele's face. Michele was face up, her head under the faucet, her legs and feet inside the bathtub. Two more neighbors came in and observed Michele's body in the same position: face up, with her head under the faucet, and her legs and feet inside the bathtub. They lifted Michele out of the tub and MacNeill began CPR. One of the neighbors performed chest compressions while MacNeill leaned over Michele's head to periodically administer rescue breaths. However, the neighbor did not observe MacNeill's

mouth ever touching Michele's, nor did Michele's chest rise and fall when MacNeill administered the rescue breaths. Two paramedics arrived and took over CPR. When the paramedics began CPR, Michele's color instantly changed from bluish to a pink fleshy color. A gurgling sound came from her chest, and she expelled quite a lot of fluid from her mouth more than once—at least three to four cups the first time and a substantial amount the second time.

¶20   While the paramedics performed CPR, MacNeill told them that he had only been away from the home "for a short period of time," during which Michele "overdosed on her pain medication," slipped in the tub, and hit her head. MacNeill said he found Michele face down, "slumped over the tub" with her upper body inside the tub and her lower body out of the tub. MacNeill then began yelling and became increasingly loud and agitated—to the point that the officers and paramedics feared for their safety and removed him from the room. Shortly thereafter, the ambulance arrived, and MacNeill accompanied Michele to the hospital.

¶21   Michele was pronounced dead on arrival. The emergency-room doctor saw no injuries consistent with falling into the bathtub. Because the doctor could not determine the cause of death, he called the Medical Examiner's Office.

¶22   The MacNeills' adult son returned home that evening with the son's girlfriend. MacNeill asked the two to accompany him to the bathroom where MacNeill had found Michele that morning. The son's girlfriend noticed that the bathroom was clean, with no trace of blood, although MacNeill told her when he found Michele that day "there was blood everywhere." MacNeill asked the girlfriend to retrieve Michele's pills. She found various drugs, but some of the bottles had very few pills in them. MacNeill and his son counted the pills; MacNeill kept repeating, Michele "was not taking her pills." MacNeill became

frustrated, said he "did not want to do this anymore," and had his son's girlfriend flush the pills down the toilet.

¶23   When Alexis returned home that evening, she went straight to the bedroom to look for the medications. But the room had been "cleaned out." Items that had been there the day before—a hospital bed, stuffed animals, and blankets—had been removed. The bathroom rug was gone. While looking for her mother's medication around the house, Alexis found the bathroom rug, a pile of wet towels and clothing, and other of Michele's belongings in the garage.

¶24   Also gone was the "little black book" in which Alexis tracked her mother's medication intake. Alexis asked MacNeill where her mother's medication was; he told her, "I don't know. I think the police might have taken it." Alexis found the small pad of paper she had tracked Michele's medication on for the first few days after surgery in the drawer where she left it.

¶25   When Alexis asked MacNeill what happened, he took her into the bathroom to show her how he found Michele. MacNeill gave Alexis the same description he had given the paramedics: Michele was face down, "slumped over the tub" with her upper body inside the tub and her lower body outside the tub. He told Alexis that the bath was full and the water was off.

¶26   Rachel, the MacNeills' other adult daughter, arrived later that evening. MacNeill said that they "needed to get the autopsy done . . . right away" because "he was concerned that there would be a police investigation," and he "didn't want . . . anyone to think he murdered [Michele]."

¶27   Although MacNeill had spent his day performing CPR on his wife, accompanying her to the hospital, cleaning up her personal belongings, tending to his family, and providing his neighbors with a tour of the renovations he completed in the home, he also spent time that day communicating with Gypsy.

The two talked on the phone twice and texted each other thirty times.

¶28 Several days later, MacNeill spoke with the Medical Examiner, Dr. Maureen Frikke. He gave the same account he had given the emergency responders and his daughters: he found Michele slumped over the tub with her face "completely submerged" and her lower body hanging outside of the tub. Dr. Frikke determined that the manner of Michele's death was "natural," and her cause of death was cardiovascular disease with hypertension and myocarditis.

¶29 Michele's funeral was held three days later. Before the service, MacNeill helped set up, running back and forth from the church to his car without a cane. As people started arriving, however, he began limping and using the cane. Gypsy attended the funeral, and the two texted throughout the service. After the funeral, a family friend approached MacNeill and offered to help care for his minor daughters. MacNeill told her that he had already hired a nanny.

¶30 MacNeill's adult daughters also offered to care for their younger siblings, but MacNeill asked Rachel to go with him to church to "pray about getting a nanny." When Rachel arrived, MacNeill did not want to go inside, but instead remained on a bench outside the church. Soon, a woman approached Rachel and MacNeill from the parking lot and said, "I'm so sorry for your loss. I was at the funeral." She told them that her name was Gillian and that she had attended nursing school. MacNeill asked for her phone number, and "Gillian"—who was actually Gypsy Gillian Willis—left. Nine days after Michele's death, MacNeill hired Gypsy as the family nanny and moved her into the MacNeill home. However, Gypsy never fulfilled the role of a nanny in the MacNeill household—the children were "left alone" and took care of themselves.

¶31    Gypsy and MacNeill travelled to Wyoming, where Gypsy introduced him to her family as her fiancé. By the end of the summer she held herself out to the public as Gillian MacNeill. The two applied for an identification card that listed the date of their marriage as April 14, 2007—the day of Michele's funeral.[2]

¶32    Having witnessed MacNeill's behavior after Michele's death, Alexis, Rachel, and Michele's sister asked investigators to re-examine Michele's manner of death. The Utah County Attorney's Office asked a toxicologist to examine Dr. Frikke's toxicology report from Michele's autopsy. The report stated that at the time of death, Michele's blood contained Valium, Percocet, Phenergan, and Ambien in concentrations likely to render her "severely obtunded," "difficult to arouse," potentially "asleep," and "unable to respond constructively to [her] environment." The Utah County Attorney's Office also asked Dr. Todd Grey, Dr. Frikke's successor, to review Dr. Frikke's conclusions. Dr. Grey changed the manner of death from "natural" to "undetermined" and changed her cause of death from heart disease to the combined effects of heart disease and drug toxicity.

¶33    In addition to re-examining the physical evidence, the State interviewed the MacNeills' youngest daughter at the Children's Justice Center. She reported that, on the day of Michele's death, MacNeill had picked her up from school and the two returned home to find Michele in the bathtub and still in her clothes. She explained that MacNeill asked her to go next door for help, and after she brought her neighbor back to the MacNeill home, the neighbor sent her next door to play with the neighbor's two children, where she remained for the rest of the afternoon. Following the CJC interview, state investigators

---

2. MacNeill filled out an application for a military identification card to provide Gypsy access to a military base in Ogden.

requested that Alexis ask the girl several follow-up questions. Alexis complied, and the girl provided more detail about the position of Michele's body in the tub, the amount of water in the tub, and the items of clothing Michele was wearing.

¶34    The State charged MacNeill with murder, a first degree felony, and obstruction of justice, a second degree felony.

*The Trial*

¶35    Before trial, MacNeill moved to exclude the MacNeills' youngest daughter from testifying. MacNeill argued that, while questioning the girl after the CJC interview, Alexis had used improper interview techniques, resulting in "false memories." The trial court granted MacNeill's motion in part and denied it in part. The court ruled that the girl was not competent to testify at trial because "after the Children's Justice Center interview, [the youngest MacNeill daughter] was subjected to suggestive and repeated questioning about material facts by an untrained interviewer with bias as to the suspect's guilt or innocence and bias as to her own pecuniary interests." But the trial court admitted the girl's CJC interview, and she appeared in court at trial for cross-examination.

¶36    MacNeill also moved to exclude the testimony of five jailhouse informants that the prosecution planned to call. Four were federal inmates who had served time with MacNeill before the State charged him with murder.[3] One (the State Inmate) knew MacNeill from time served together in the Utah County Jail. The trial court denied the motion on the ground that "(1) the weaknesses of jailhouse informant testimony could be exposed through rigorous cross-examination; and (2) the jury would be instructed on how to judge the credibility of witnesses, and may

_____

3. MacNeill served time in federal prison for charges unrelated to Michele's murder.

be instructed on the heightened motive of jailhouse informants to misrepresent." The trial court also ordered that "the State, in writing, disclose to the defense with respect to each inmate who will testify, any and all benefits promised, expressed or implied, realized now or to be realized in the future, in exchange for testimony in the MacNeill case, together with any documentation of the deal."

¶37 In response to the trial court's order, the State filed a Notice of Benefits Offered or Provided to Jailhouse Informants. The State disclosed consideration given to the State Inmate. It also represented—falsely, as it turned out—that the four federal inmates had not "requested any recommendations [from the State], nor has anyone else on [their] behalf. If any such request is made it will be honored. Other than that, there is no agreement to exchange [the federal inmates'] testimony for consideration from the State of Utah. Nothing has been given to [them], and there are no promises outstanding."

¶38 On the first day of trial, the court ordered that all witnesses be excluded from the courtroom while not testifying and also ordered that "fact witnesses shall not watch or listen to television, radio, or internet news coverage of the trial while under trial subpoena." The prosecution did not inform the federal inmates of the exclusion order for almost a week.

A. Medical Testimony

¶39 At trial a cardiologist testified that the inflammation in Michele's heart was "benign" and not "severe enough to present a significant risk of cardiac death." Dr. Grey also testified that the inflammation was "not very severe." The State called an expert in forensic pathology, who testified that he found no evidence of myocarditis. The expert also presented a new theory on Michele's cause of death: drowning.

¶40   The forensic pathologist based his conclusion on five facts. First, Michele regurgitated large amounts of water while emergency responders performed CPR, indicating that she had swallowed water. Second, she had water in her airway, which indicated that she had inhaled a significant amount of water. Third, her lungs were twice as heavy as typical lungs. Fourth, fluid was found in the chambers of her lungs. Finally, her blood was significantly diluted, which occurs when someone inhales water and it streams into the blood vessels and into general circulation.

B.     The Jailhouse Informants

¶41    All five jailhouse informants testified against MacNeill.[4] Inmate One testified that he knew MacNeill from a prison computer class. One night, Inmate One saw a picture of MacNeill on a television news show, and while he could not hear the audio, he could tell that the show claimed that MacNeill had murdered his wife. When Inmate One told MacNeill about the television show, MacNeill replied that "[t]hey're just [running the show] because my girlfriend is about to get out." But MacNeill later "opened up about it." He said that he "gave [his wife] some oxy and some sleeping pills and then he . . . got her in the bathtub." MacNeill then said "he had to help her out," and he "held her head under the water for a little while." When Inmate One asked MacNeill why he killed Michele, MacNeill responded that "she was in the way" and "she wanted the house and the kids," but that the authorities "couldn't prove that he . . . did anything."

---

4. The trial court ordered that the four federal inmates be referred to by number to protect their privacy and safety. We refer to them by number as well.

¶42    Inmate One testified that he had not "made any request for any consideration." MacNeill cross-examined Inmate One using phone records he had obtained from the prison. In one phone call Inmate One told his mother that the State was going to offer him a deal, and he would speak with his lawyer to find out the details of the deal. In numerous phone calls, he told family members that he planned on being released from prison by Christmas in exchange for his testimony because MacNeill's trial was scheduled for October 9 to November 9, and he would have "from November 9 up until Christmas to get out." And in a phone call with his federal defense investigator, Inmate One explained that Jeff Robinson, the Utah County Attorney's Office investigator assigned to MacNeill's case, had told him that he was "willing to help [Inmate One] out in any way that he could."

¶43    MacNeill also confronted Inmate One with evidence of communications between Inmate One and Robinson in which Robinson stated, "What I really want is to get you out [early]. . . . You really are one of my key, absolute key witnesses. So it's really important to us to make sure that you are taken care of, and kept safe, and . . . to make sure that your needs are taken care of." MacNeill also pointed out that Robinson had expressed a desire to communicate with Inmate One by phone rather than email so that MacNeill's defense attorneys would not learn of the communications between the two.

¶44    Inmate Two testified that he was MacNeill's cellmate for two years. Inmate Two "heard rumors" that "supposedly [MacNeill] murdered his wife" and asked MacNeill whether it was true. Inmate Two testified that MacNeill told him that "they couldn't prove it," and that the medication she was taking was prescribed.

¶45    Inmate Three testified that he noticed an article about MacNeill in People magazine that claimed MacNeill murdered his wife. Inmate Three asked MacNeill if he had murdered his

wife, to which MacNeill responded, "No, I didn't murder my wife. If I did, they don't have any evidence of it."

¶46 Inmate Four testified that he had heard that MacNeill killed his wife. When Inmate Four asked MacNeill about it, MacNeill responded, "The bitch drowned."

¶47 The State Inmate testified that he was housed in the same jail unit as MacNeill while MacNeill awaited the murder trial. The State Inmate asked MacNeill why he did not wear the same required jail-issued shoes as the other inmates, and MacNeill responded that he could "get away with a lot of things. For instance, . . . I'm getting away with my murder." When asked if MacNeill elaborated on his statement, the State Inmate testified that MacNeill stated: "I'm getting away with murdering my wife." The State Inmate testified that when he offered condolences for Michele's death, MacNeill said "Oh, no, I'm glad the bitch is dead."

¶48 The jury convicted MacNeill of murder, a first degree felony, and obstruction of justice, a second degree felony.

¶49 MacNeill filed a post-trial Motion to Arrest Judgment or For a New Trial on the ground that the Utah County Attorney's Office failed to disclose exculpatory evidence in the form of consideration for Inmate One's testimony. MacNeill based the motion on emails and telephone call recordings from August through October. The various communications revealed that Inmate One planned on being released from prison in December 2013 in exchange for his testimony at MacNeill's trial. And sure enough, one week after trial, Robinson wrote letters to the U.S. Attorney's Office and Inmate One's federal defender highly recommending that "leniency be shown to [Inmate One] for his truthful and courageous testimony." Inmate One was released from federal custody on December 13, 2013. The communications also revealed that, in violation of the court's exclusion order,

Inmate One viewed portions of the trial testimony on the news before his scheduled date to testify.

¶50 The trial court found that, although the State failed to disclose evidence of the deal between Inmate One and Robinson, "a jury possessed of this additional information would not have rendered a different verdict." The court came to this conclusion because cross-examination demonstrated (1) that Inmate One "was ready to procure and accept early release by whatever means it could be obtained," and (2) that Inmate One believed "testifying for the prosecution in Utah [would be] the catalyst for his early release." The trial court found that although the State suppressed exculpatory evidence related to Inmate One, the new information provided by MacNeill in his post-trial motion was cumulative and "would not have been reasonably likely to affect the outcome of the trial." The trial court therefore denied MacNeill's motion.

ISSUES AND STANDARDS OF REVIEW

¶51 MacNeill raises three issues on appeal. First, MacNeill contends that the State did not present sufficient evidence to support a conviction of murder. "When we consider an insufficiency of the evidence claim, we review the evidence and all inferences which may reasonably be drawn from it in the light most favorable to the verdict of the jury." *State v. Nielsen*, 2014 UT 10, ¶ 46, 326 P.3d 645 (citation and internal quotation marks omitted). We will reverse a guilty verdict "only when the evidence, so viewed, is sufficiently inconclusive or inherently improbable that reasonable minds must have entertained a reasonable doubt that the defendant committed the crime of which he or she was convicted." *Id.* (citation and internal quotation marks omitted).

¶52 Second, MacNeill contends that the trial court abused its discretion when it denied his new trial motion on the ground

that newly discovered impeachment evidence did not create a reasonable probability that the result of the proceeding would have been different if it had been presented at trial. "A trial court has discretion in determining whether to grant or deny a motion for a new trial, and we will not reverse a trial court's decision absent clear abuse of that discretion." *State v. Harmon*, 956 P.2d 262, 265–66 (Utah 1998).

¶53   Third, MacNeill contends that cumulative prejudice stemming from prosecutorial misconduct resulted in the denial of his right to a fair trial. When reviewing a claim of cumulative error, we "apply the standard of review applicable to each underlying claim of error." *State v. Perea*, 2013 UT 68, ¶ 33, 322 P.3d 624 (citation and internal quotation marks omitted).

ANALYSIS

I. Sufficiency of the Evidence

¶54   MacNeill contends that "the circumstantial evidence in this case was far from sufficient to support a conviction." He argues that because "there were no eyewitnesses in this case to any event that would have explained the cause of [Michele's] death" and "the investigation failed to reveal any physical evidence that would demonstrate that anyone intentionally contributed to [Michele's] death," "the evidence is insufficient for a reasonable jury to convict."

¶55   At trial the State bore the burden of proving beyond a reasonable doubt that MacNeill intentionally or knowingly caused Michele's death. *See* Utah Code Ann. § 76-5-203(2)(a) (LexisNexis 2012).

¶56   When determining the sufficiency of circumstantial evidence, we must "determine (1) whether there is any evidence that supports each and every element of the crime charged, and

(2) whether the inferences that can be drawn from that evidence have a basis in logic and reasonable human experience sufficient to prove each legal element of the offense beyond a reasonable doubt." *State v. Brown*, 948 P.2d 337, 344 (Utah 1997) (citation and internal quotation marks omitted).

¶57    It is "a well-settled rule that circumstantial evidence alone may be sufficient to establish the guilt of the accused." *State v. Harris*, 2015 UT App 282, ¶ 9, 363 P.3d 555 (citation and internal quotation marks omitted). Indeed, the idea that "circumstantial evidence is necessarily less convincing and of less value than direct evidence . . . is a misstatement of the law." *State v. Clayton*, 646 P.2d 723, 725 (Utah 1982) (internal quotation marks omitted). On the contrary, "[c]ircumstantial evidence may even be more convincing than direct testimony." *State v. Housekeeper*, 588 P.2d 139, 140 (Utah 1978). In sum, "'[d]irect evidence is not required' to establish guilt." *Harris*, 2015 UT App 282, ¶ 9 (quoting *State v. Nielsen*, 2014 UT 10, ¶ 47, 326 P.3d 645). Rather, the prosecution may present "a mosaic of circumstantial evidence that considered as a whole constitutes proof beyond a reasonable doubt." *State v. Mercado*, 635 A.2d 260, 264 n.4 (R.I. 1993).

¶58    "[C]redibility is an issue for the trier of fact," and "in reviewing a jury verdict we assume that the jury believed the evidence supporting the verdict." *Brown*, 948 P.2d at 343–44 (citation and internal quotation marks omitted). When "the jury returns a verdict that is reasonably sustained by circumstantial evidence and the inferences drawn from it, we must uphold the jury's verdict." *Nielsen*, 2014 UT 10, ¶ 47.

¶59    "A party challenging a fact finding must first marshal all record evidence that supports the challenged finding." Utah R. App. P. 24(a)(9). We view this requirement "as a natural extension of an appellant's burden of persuasion." *Nielsen*, 2014 UT 10, ¶ 41.

¶60    To support his insufficiency claim, MacNeill argues that "the *only* postulation presented by the State suggesting that there was a murder and that [MacNeill] committed the alleged murder was introduced through testimony of convicted and incarcerated felons." (Emphasis added.) MacNeill further maintains that "only one of these informants, [Inmate One,] testified that [MacNeill] affirmatively insinuated that he did anything of a criminal nature."

¶61    First, Inmate One did testify that MacNeill told him that he "gave [his wife] some oxy and some sleeping pills and he . . . got her . . . in the bathtub," and that "he held her head under the water for a little while." But Inmate One was not the only inmate witness who testified that MacNeill explicitly admitted his guilt. The State Inmate testified that MacNeill told him, "I'm getting away with murdering my wife." He also testified that MacNeill said that, before Michele's death, his relationship with her "was going downhill" because she was "trying to get his money" and "was not going to let him keep cheating."

¶62    Furthermore, a jury verdict is supported not only by the testimony admitted into evidence, but also by the inferences that a jury may reasonably draw from that testimony. Inmates Two, Three, and Four also testified that they asked MacNeill whether he murdered his wife. MacNeill answered that "they couldn't prove it," and, following a denial, that "[i]f I did, they don't have any evidence of it," and also that "[t]he bitch drowned." A reasonable person could interpret these responses as more likely to be offered by a guilty man than an innocent man. Thus, a juror believing this testimony could, in light of the totality of evidence presented at trial, reasonably infer that MacNeill acknowledged having killed his wife.

¶63    MacNeill also argues that "the testimony of jailhouse informants is known to be unreliable and has a long history of

leading to wrongful convictions." This may be true. *See, e.g.*, R. Michael Cassidy, *"Soft Words of Hope":* Giglio, *Accomplice Witnesses, and the Problem of Implied Inducements*, 98 Nw. U. L. Rev. 1129, 1130 (2004) ("It is now widely accepted that the practice of conditioning leniency on cooperation in criminal cases is rife with the potential for abuse."). But "credibility is an issue for the trier of fact, in this case the jury." *State v. Brown*, 948 P.2d 337, 343 (Utah 1997) (citation and internal quotation marks omitted). "We do not 'sit as a second trier of fact.'" *State v. Davis*, 2014 UT App 77, ¶ 4, 324 P.3d 678 (quoting *State v. Boyd*, 2001 UT 30, ¶ 16, 25 P.3d 985). Rather, "'[i]t is the exclusive function of the jury to weigh the evidence and to determine the credibility of the witnesses.'" *Id.* (quoting *State v. Booker*, 709 P.2d 342, 345 (Utah 1985)).

¶64 As explained in the next section of this opinion, defense counsel's cross-examination of the jailhouse witnesses exposed cracks in their credibility. Defense counsel thoroughly cross-examined both Inmate One and the State Inmate. On cross-examination, defense counsel elicited testimony from the State Inmate about his prior theft and shoplifting charges, lying to police, defrauding his landlord, and running a counterfeit watch scheme, as well as his expected consideration in exchange for testifying against MacNeill at trial, including consideration that the State failed to disclose prior to trial.

¶65 Furthermore, the trial court gave an exemplary jury instruction on the issue of in-custody-informant credibility. The court instructed the jury, "A witness who believes that he may be able to obtain his own freedom, or receive a lighter sentence by giving testimony favorable to the prosecution, has motive to testify falsely. Therefore, you must examine his testimony with caution and weigh it with great care." The court also instructed the jury to consider the "criminal history of the informant," whether "the informant has ever changed his or her testimony," whether "the informant has received anything (including

leniency in prosecution, personal advantage, or vindication) in exchange for testimony," and "[a]ny other evidence related to the informant's credibility."

¶66　In sum, the premise of MacNeill's argument—that a criminal conviction must rest on direct evidence—is incorrect as a matter of law, and MacNeill's claim that only one jailhouse informant testified that MacNeill explicitly confessed to the murder is incorrect as a matter of fact. Two such informants testified that MacNeill admitted to killing his wife, and three more testified that MacNeill made statements from which jurors could, in light of the totality of the trial evidence, reasonably infer that MacNeill killed his wife. So the shortcomings MacNeill identifies in the trial evidence simply do not exist. We reject his sufficiency claim on this ground alone.

¶67　Moreover, as explained above, an appellant challenging a jury verdict must "first marshal all record evidence that supports the challenged finding." Utah R. App. P. 24(a)(9). An argument that does not fully acknowledge the evidence supporting a verdict has little chance, as a matter of logic, of demonstrating that the verdict lacked adequate factual support. *See Dillon v. Southern Mgmt. Corp. Ret. Trust*, 2014 UT 14, ¶ 59, 326 P.3d 656 (citing *State v. Mitchell*, 2013 UT App 289, ¶ 31, 318 P.3d 238). Accordingly, "[a]n appellant cannot demonstrate that the evidence supporting a factual finding falls short without giving a candid account of that evidence." *Id.* (citation and internal quotation marks omitted).

¶68　MacNeill's brief does not give a candid account of the evidence supporting the jury's verdict. On the contrary, he ignores much of that evidence. He argues that the testimony of Inmate One constituted "the sole evidence of a homicide." But he fails to acknowledge any of the evidence laid out in paragraphs 2 through 33 and 61 through 62 above.

¶69 Ignoring incriminating evidence does not make it go away. The circumstantial evidence recited above gave the jury "a basis in logic and reasonable human experience" to conclude that MacNeill wanted Michele out of the picture so he could be with Gypsy; that MacNeill manipulated Michele into having a facelift despite the physician's concerns about her blood pressure; that MacNeill arranged to have available an abundance of prescription medications; that Michele was unlikely to have voluntarily taken those drugs, because she did not need them, did not like taking drugs, and normally used less than prescribed; that MacNeill attempted to manufacture a partial alibi by ensuring his photograph was taken at his award ceremony; that MacNeill gave a false description of the positioning of Michel's body in the tub; that, contrary to his explanation, Michele, heavily drugged, drowned in the tub; that MacNeill pretended to, but did not, perform CPR on Michele; that MacNeill destroyed or attempted to destroy evidence of Michele's murder; that MacNeill manufactured an excuse for his inability to lift Michele's body out of the tub by reporting scattered claims of various illnesses to his family and coworkers—in short, that MacNeill intentionally or knowingly caused Michele's death. *See State v. Brown*, 948 P.2d 337, 344 (Utah 1997) (citation and internal quotation marks omitted).

¶70 Because the jury returned "a verdict that is reasonably sustained by circumstantial evidence and the inferences drawn from it, we must uphold the jury's verdict." *See State v. Nielsen*, 2014 UT 10, ¶ 47, 326 P.3d 645. Although MacNeill maintains that the circumstantial evidence was insufficient to support his conviction, we are satisfied that the evidence presented at trial supports every element of the crime charged, and "the inferences that can be drawn from that evidence have a basis in logic and reasonable human experience sufficient to prove each legal element of [murder] beyond a reasonable doubt." *See Brown*, 948 P.2d at 344 (citation and internal quotation marks omitted). MacNeill has presented nothing suggesting that the

evidence was "sufficiently inconclusive or inherently improbable that reasonable minds must have entertained a reasonable doubt that the defendant committed the crime of which he [or she] was convicted." *See id.* (alteration in original) (citation and internal quotation marks omitted). Accordingly, we reject MacNeill's challenge to the sufficiency of the evidence.

## II. Impeachment Evidence

¶71   MacNeill challenges the trial court's denial of his motion to arrest judgment or for a new trial. MacNeill contends that "the prosecution withheld impeachment evidence that would have undermined the credibility of the State's only witness" who supported the State's murder case. Specifically, MacNeill argues that he "suffered extreme prejudice by being denied the opportunity to fully cross-examine [Inmate One] with the facts that would demonstrate his lack of credibility."

¶72   The withholding "by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or the bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963); *see also State v. Bakalov*, 1999 UT 45, ¶ 30, 979 P.2d 799. The duty to preserve such evidence "applies both to substantively exculpatory evidence and to that which may be used for impeachment." *State v. Bisner*, 2001 UT 99, ¶ 32, 37 P.3d 1073 (citing *United States v. Bagley*, 473 U.S. 667, 676 (1985); *Giglio v. United States*, 405 U.S. 150, 154–55 (1972)).

¶73   "[A] *Brady* violation occurs only where the state suppresses information that (1) remains unknown to the defense both before and throughout trial and (2) is material and exculpatory, meaning its disclosure would have created a 'reasonable probability' that 'the result of the proceeding would have been different.'" *Id.* ¶ 33 (additional citation and internal quotation marks omitted). It is "the cumulative or collective

effect of the evidence that is weighed when determining whether the disclosure would have created a reasonable probability of a different result." *Tillman v. State*, 2005 UT 56, ¶ 32, 128 P.3d 1123. However, when evidence is "cumulative of other impeachment evidence available at trial," it does "not constitute material evidence for *Brady* purposes." *Id.* ¶ 37.

¶74 Before trial, the State filed a Notice of Benefits Offered or Provided to Jailhouse Informants asserting that the State had promised and could promise Inmate One nothing in exchange for his testimony:

> The State of Utah has no authority over federal inmates and had nothing to offer Inmate #1 in exchange for his cooperation in the investigation and his testimony at trial. There is no agreement [to] exchange Inmate #1's testimony for consideration from the State of Utah. Nothing has been given to him, and there are no promises outstanding. (If Inmate #1 were to request a recommendation from Investigator Robinson or the prosecution, that request would be honored. To date, however, he has not made any requests for any consideration.)

Before filing the Notice of Benefits, a prosecutor met with Robinson and asked him what Inmate One had asked for in return for his cooperation in the case. Robinson responded that Inmate One "had not asked me for anything."

¶75 Despite the State's claim that it did not offer Inmate One any consideration for his testimony and that no promises were outstanding, MacNeill discovered evidence during trial showing that Robinson had offered to write a letter to the U.S. Attorney's Office and Inmate One's federal defender in exchange for his testimony. MacNeill used that evidence to great effect at trial.

¶76 Inmate One testified on direct examination that the Notice of Benefits was completely accurate—that his only motives for testifying were (1) to protect others and (2) to do the right thing as part of Inmate One's rehabilitation, and that he had done nothing to pursue a possible benefit for testifying. But on cross-examination, MacNeill confronted him with the following evidence: a phone call with his mother, during which he admitted that the State was planning to cut him a deal for testifying; a statement to his mother that he was "putting that date, I'm putting Christmas in my head because the [trial] is going from October to November"; a statement to his mother that he was planning to "talk with [his niece] and have her crack down and see what [Robinson] is going to do . . . . And make sure he do the right thing, . . . Because if he ain't, then I ain't"; a statement to his niece referring to his testimony for the State as "Operation Utah"; a statement by his federal defense investigator explaining that if his testimony was "really great and kind of puts the nail in the guy's coffin, then you know, you might get the two-and-a-half off"; Inmate One's statement to his federal defense investigator that Robinson had told him he was "willing to help me out in any way that he could"; a telephone call between Inmate One and Robinson in which Robinson told Inmate One, "What I really want is to get you out before, and I just wish we could do that somehow, some way . . . . [You] really are one of my key, absolute key witnesses. So it's really important to us to make sure that you are taken care of, and kept safe, and you know, I just want to make sure that your needs are taken care of"; a statement by Robinson that he would call Inmate One's federal public defender and defense investigator; and a statement by Robinson to Inmate One that he preferred to communicate with Inmate One by phone rather than email so MacNeill would not learn of the communications. This uncontroverted evidence demonstrated that Inmate One had falsely testified that he had received no promises of leniency from Robinson and that Robinson had falsely represented that he had offered no promises of leniency to Inmate One.

¶77 But the matter did not end there. After trial, MacNeill filed a request under the Freedom of Information Act seeking information from the federal prison where Inmate One was incarcerated. MacNeill obtained Inmate One's email and telephone correspondence for the months of September and October 2013. These communications revealed that Inmate One planned on being released from prison in December 2013 in exchange for his testimony at MacNeill's trial. MacNeill also obtained an email from Inmate One's federal defense investigator informing Inmate One that he had "talked with the investigator out there, that Jeff Robinson will be providing us and the U.S. Attorney's Office with information after the trial about what all you did, you know testimony and assistance." And one week after trial, as promised, Robinson wrote a letter to the U.S. Attorney's Office and Inmate One's federal defender highly recommending that "leniency be shown to [Inmate One] for his truthful and courageous testimony."

¶78 After receiving this information, MacNeill filed a Motion to Arrest Judgment or For a New Trial on the ground that the Utah County Attorney's Office failed to disclose exculpatory evidence in the form of consideration for Inmate One's testimony. In support of the State's opposition to MacNeill's motion for a new trial, Robinson filed an affidavit stating that a prosecutor for the State had inquired whether Inmate One had asked for anything in return for his cooperation in the case and Robinson responded that Inmate One "had not asked me for anything." In the same affidavit, Robinson also stated that he "did not think to inform [the prosecutor that talked to him] or any of the prosecutors that Inmate #1's attorney had asked for a recommendation if [Robinson] felt comfortable with his assistance."

¶79 The trial court meticulously analyzed this issue in a 40-page ruling. The court entered 60 findings of fact and 61 subsidiary findings, and devoted 18 pages to setting forth

conclusions of law. In making its conclusions, the court relied on two journal articles, one practice guide, and 16 state and federal cases. The court scrupulously examined the evidence withheld by the State and declared that Robinson's claim that he merely forgot to tell prosecutors that Inmate One had requested consideration for his testimony and he had agreed to give it "in the face of direct questioning tests the bounds of credulity."[5]

¶80    The trial court concluded that the State suppressed exculpatory evidence related to Inmate One, specifically, evidence showing that Inmate One had asked for a recommendation letter and that Robinson had agreed to provide one. The court further concluded that "[t]his information remained unknown to defense counsel before and throughout trial." The court also observed that "the State's attempt to down-play the importance of Inmate 1's trial testimony rings hollow,"

---

5. The court made an in-depth examination of the inherent risk of using jailhouse informant testimony. The court quoted a 2007 policy review that explained jailhouse informants' motives to fabricate testimony and opined that "there is a high risk of pivotal, but perjured testimony" and therefore "the prosecutor's professional responsibilities are a critical safeguard to preventing wrongful convictions." The court emphasized that "[p]rosecutors do not have a duty to 'make an investigation on behalf of the defendant' or to 'search[] for exculpatory and mitigating evidence,'" but "[g]iven the powerful incentive informants have to fabricate evidence favorable to the government and the prosecutor's primary duty to do justice, prosecutors should undertake meaningful efforts to corroborate information provided by jailhouse informants, and to investigate informant reliability." (Quoting *State v. Pliego*, 1999 UT 8, ¶ 9, 974 P.2d 279). The court concluded that in this case it was "unclear what effort prosecutors took to arrive at a reasonable belief that Inmate[] 1 [was] providing truthful information."

and that if "MacNeill had only to show that the State committed serious errors in this case, his motion for new trial would be granted." But, as the trial court explained, "the law requires more."

¶81 The trial court concluded that "after careful review of the record, . . . disclosure of Inmate 1's request for a recommendation letter, and Robinson's promise to provide it would not have been reasonably likely to affect the outcome of the trial" in light of defense counsel's "withering cross-examination." The court reasoned that by the "use of Inmate 1's prison emails and telephone conversations, defense counsel painted Inmate 1 for what he was—a calculating and sophisticated convict, ready to say or do anything necessary to get out of prison early." The court characterized Inmate One's cross-examination as "long, pointed, and devastating." The court explained that Inmate One's "true motives for testifying in Utah were revealed. It was clear that he had every intention of asking for and accepting anything he could get . . . to secure his early release." After careful review of Inmate One's trial testimony on cross-examination and the evidence withheld by the State, the court concluded that "a jury possessed of this additional information would not have rendered a different verdict."

¶82 MacNeill claims that in ruling on his motion for new trial, "the trial court erroneously neglected to discern the prejudice resulting from the introduction of the only damning evidence in this case: tainted testimony from an informant who had been given consideration, in this case a release from prison, and who attempted to conform his story by observing prior evidence introduced in the case that he saw while watching trial testimony on television." But in challenging the trial court's ruling, MacNeill fails to refute or even acknowledge the trial court's exhaustive memorandum decision. He has made no attempt to identify any flaws in the court's findings or conclusions. Because MacNeill has failed to address "the basis of

the district court's ruling, we reject this challenge." *See Golden Meadows Props., LC v. Strand*, 2010 UT App 257, ¶ 17, 241 P.3d 375.

¶83 Nor has MacNeill analyzed his claim under the framework of *Brady v. Maryland*, 373 U.S. 83 (1963). An adequately briefed argument must "contain the contentions and reasons of the appellant with respect to the issues presented, including the grounds for reviewing any issue not preserved in the trial court, with citations to the authorities, statutes, and parts of the record relied on." Utah R. App. P. 24(a)(9). "An appellant that fails to devote adequate attention to an issue is almost certainly going to fail to meet its burden of persuasion. A party must cite legal authority on which its argument is based and then provide reasoned analysis of how that authority should apply in the particular case, including citations to the record where appropriate." *Bank of America v. Adamson*, 2017 UT 2, ¶ 13. In short, an issue is inadequately briefed "when the overall analysis of the issue is so lacking as to shift the burden of research and argument to the reviewing court." *State v. Thomas*, 961 P.2d 299, 305 (Utah 1998).

¶84 MacNeill cites *Giglio v. United States*, 405 U.S. 150 (1972), in support of his claim that "failure to provide evidence of any understanding or agreement with a key witness in exchange for testimony that would be relevant to that witness's credibility," "will result in the reversal of any verdict of guilt and will require a new trial." But he fails to develop any analysis beyond that assertion. He does not engage in an analysis under either *Giglio* or *Brady* to demonstrate why the evidence he received after trial was "material either to guilt or punishment." *See Brady*, 373 U.S. at 87. Because MacNeill has failed to address the trial court's detailed ruling, failed to develop his citation to authority, and failed to provide any reasoned analysis based on that authority, we conclude that he failed to carry his burden of persuasion on appeal. *See State v. Roberts*, 2015 UT 24, ¶ 18, 345

P.3d 1226 (holding that "our adequate briefing requirement is . . . a natural extension of appellant's burden of persuasion" (citation and internal quotation marks omitted)). We reject his claim on this ground.

¶85 Moreover, we discern no flaw in the trial court's ruling. Robinson's blatantly false statements had the potential to subvert the course of justice. But in the end, they did not. The jury learned that Inmate One expected the State to cut him a deal for testifying; that he expected to be released before Christmas; that if Robinson would not "do the right thing," neither would Inmate One; that the federal defense investigator encouraged him to give testimony that "kind of puts the nail in the guy's coffin"; that Inmate One told his federal defense investigator that Robinson was "willing to help me out in any way that he could"; that Robinson had told Inmate One that he wanted to make sure that Inmate One's "needs are taken care of"; that Robinson told Inmate One that he would call his federal public defender and defense investigator; and that Robinson preferred to communicate by phone rather than email so that MacNeill would not learn of the communications.

¶86 The jury did not learn that Inmate One's federal defense investigator told Inmate One that Robinson "will be providing us and the U.S. Attorney's Office with information after the trial about what all you did, you know testimony and assistance." And of course the jury did not learn that one week after trial, as promised, Robinson wrote a letter to the U.S. Attorney's Office and Inmate One's federal defender highly recommending that "leniency be shown to [Inmate One] for his truthful and courageous testimony." But the trial court correctly ruled that this additional evidence was "cumulative of other impeachment evidence available at trial," and therefore it does "not constitute material evidence for *Brady* purposes." *See Tillman v. State*, 2005 UT 56, ¶ 37, 128 P.3d 1123. Therefore, the trial court did not exceed its discretion in denying MacNeill's motion for a new

trial on this ground. *See State v. Harmon*, 956 P.2d 262, 265–66 (Utah 1998).

## III. Cumulative Error

¶87    MacNeill finally contends that he was "denied a fair trial as a result of numerous instances of prejudicial prosecutorial misconduct." MacNeill argues that three specific errors denied him the right to a fair trial. First, he claims that the State "unfairly and improperly coached [Alexis] to convey an unsubstantiated non-factual version of the discovery of [Michele's] body and the crime scene for the purpose of manufacturing corroboration for the informant's false testimony." MacNeill argues that the State approached Alexis on multiple occasions and asked her to discuss the facts of the case with the youngest daughter, who was in her custody at the time. Second, MacNeill claims that the State "failed to disclose alternative suspects." Third, he claims that the State "failed to follow the trial judge's order to exclude witnesses."[6] Under the

---

6. MacNeill also seems to claim that the prosecutors' failure to "adhere to their duty to provide discovery after [MacNeill] made numerous requests" constitutes error. However, MacNeill describes this claim in only two sentences, stating that "trial counsel, after discovering thousands of documents that [the State] failed to disclose, then filed a motion to disqualify the Utah County Attorney's office from the case. These motions and findings of the attorneys and trial judge are illustrative of the overall failure and bad faith of the prosecution in discovery matters in this case." The "motions and findings" referenced by MacNeill comprise 822 pages of the appellate record. An adequately briefed argument must "contain the contentions and reasons of the appellant with respect to the issues presented . . . with citations to the authorities, statutes, and parts of the record relied on." Utah R. App. P. 24(a)(9). MacNeill did

(continued…)

doctrine of cumulative error, "we will reverse only if the cumulative effect of the several errors undermines our confidence . . . that a fair trial was had." *State v. Dunn*, 850 P.2d 1201, 1229 (Utah 1993) (omission in original) (citation and internal quotation marks omitted).[7]

A.     The CJC Interview

¶88     MacNeill argues that the trial court erred in admitting the CJC interview into evidence. Specifically, MacNeill argues that admitting the interview was erroneous because the trial court found that Alexis improperly influenced the girl's memory of the events on April 11, 2007 by using improper interview

---

(…continued)

not specify which discovery requests the State failed to comply with in his claim that prosecutors "failed to adhere to their duty to provide discovery after [MacNeill] made numerous requests." Nor does MacNeill indicate any authority that supports his assertion that failure to comply with a discovery request constitutes error that denied him a fair trial. Accordingly, MacNeill has failed to uphold his burden of persuasion on this point. *See Bank of America v. Adamson*, 2017 UT 2, ¶ 13 (holding that an appellant who "fails to devote adequate attention to an issue is almost certainly going to fail to meet its burden of persuasion").

7. A claim of cumulative error—or more accurately, cumulative prejudice—generally asserts that errors discussed earlier in the brief, even if individually harmless, caused prejudice in combination. But MacNeill's cumulative error argument asserts three claims of error not asserted elsewhere in his brief. In any event, because we conclude that none of these alleged errors were prejudicial, his claim of cumulative prejudice necessarily fails.

techniques that planted false memories. "A trial court has broad discretion to admit or exclude evidence and its determination typically will only be disturbed if it constitutes an abuse of discretion." *State v. Whittle*, 1999 UT 96, ¶ 20, 989 P.2d 52. "A trial court abuses its discretion if it acts unreasonably." *Id.*

¶89    With respect to the CJC interview, the trial court found that it "was not tainted" because her memories "as expressed in that interview are largely consistent with prior statements to Alexis and are corroborated by the statements of other witnesses, including [MacNeill]." But the court found that "(1) after the CJC interview, [the youngest daughter] was subjected to suggestive and repeated questioning about material facts by an untrained interviewer with bias as to the suspect's guilt, and with bias as to a pecuniary interest; and (2) there is a substantial likelihood that these interview techniques implanted false memories or distorted real memories in [the youngest daughter]," and therefore she was "not competent to testify."

¶90    MacNeill's claim fails because of chronology. MacNeill challenges the trial court's admission of the CJC interview and claims that the trial court erred because it found that Alexis had improperly influenced the girl's testimony. But the improper influence that MacNeill claims tainted the girl's memory occurred after the CJC interview. The trial court made detailed findings about the unreliability of the girl's later testimony. Based on those findings, it admitted statements made in the CJC interview before Alexis questioned the girl, but excluded statements made by the girl during or after Alexis's questioning. MacNeill has not demonstrated how the girl's testimony in the CJC interview could be rendered unreliable by later questioning. And MacNeill does not challenge the trial court's finding that, "[i]nsofar as her CJC interview is concerned, [the youngest daughter] is a competent witness." Given the trial court's "broad discretion to admit or exclude evidence," we affirm its decision to admit the girl's CJC interview. *See Whittle*, 1999 UT 96, ¶ 20.

B.      Alternative Suspects

¶91    MacNeill next argues that the State did not disclose information that his son expressed homicidal ideations, because doing so would have suggested an alternative perpetrator. The record reflects otherwise. During the investigation, investigators sent an email to his son's school about "troubling" comments they discovered on his son's Twitter account. In that email, investigators made clear that the young man was "not a suspect in the death of his mother." MacNeill received a copy of this email ten months before trial. MacNeill's claim that the State failed to disclose this information at trial thus lacks factual support.

C.      Exclusionary Order

¶92    MacNeill finally argues that "the prosecution failed to follow the trial judge's order to exclude witnesses." The trial court ruled on this issue in denying MacNeill's motion for a new trial, but MacNeill does not address the detailed findings made by the trial court and makes no attempt to challenge the trial court's conclusion that MacNeill failed to prove prejudice.

¶93    "A trial court has discretion in determining whether to grant or deny a motion for a new trial, and we will not reverse a trial court's decision absent clear abuse of that discretion." *State v. Harmon*, 956 P.2d 262, 265–66 (Utah 1998). "When an exclusion order has been violated, the burden is on the accused to demonstrate that he has been prejudiced to the extent that a mistrial should be granted." *State v. Billsie*, 2006 UT 13, ¶ 12, 131 P.3d 239 (citation and internal quotation marks omitted).

¶94    After opening statements, the trial court ordered that all fact witnesses "not watch or listen to television, radio, or internet news coverage of the trial while under trial subpoena" and that the parties shall "inform their respective fact witnesses of this exclusion order." In the words of the trial court, "for reasons that

remained unexplained—the State did not inform the federal jailhouse informants of the exclusion order for almost a week." After trial MacNeill filed a Freedom of Information Act request with the Federal Bureau of Prisons and sought disclosure of Inmate One's September and October 2013 telephone conversations. These conversations showed that Inmate One watched television coverage of the trial even though he testified that he did not.

¶95 However, Inmate One's trial testimony was consistent with his report to Robinson before trial, with one exception. In his initial interview with Robinson, Inmate One reported that MacNeill gave Michele "Oxycontin." At trial, Inmate One testified that MacNeill gave Michele "oxy." When asked on cross-examination whether "oxy" meant "Oxycontin," Inmate One responded that "Oxycontin and Oxycodone are the same thing. Basically one of them has Tylenol in it or Acetaminophen, the other one doesn't . . . so I might have said Oxycontin or Oxycodone, either one."

¶96 The trial court concluded that the State's failure to inform the federal inmates about the exclusion order for almost a week did not prejudice MacNeill. We agree. Inmate One's testimony did not change materially, and MacNeill required Inmate One to address the inconsistency in his testimony about whether MacNeill gave Michele "Oxycontin" or "Oxy." MacNeill failed to demonstrate prejudice, because he could not show that this slight difference between Inmate One's version of events before and after viewing television coverage had any effect on the verdict. Accordingly, the trial court did not exceed its discretion in denying MacNeill's motion for a new trial on this ground.

¶97 In sum, MacNeill has demonstrated no abuse of discretion by the trial court. Because "we have found no error in this case, the requirements of the cumulative error doctrine are not met." *See State v. Killpack*, 2008 UT 49, ¶ 62, 191 P.3d 17.

CONCLUSION

¶98    For the foregoing reasons, the judgment of the trial court is affirmed.

——————